# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 29, 2014

Lyle W. Cayce
Clerk

No. 13-20477
Summary Calendar

PATRIZIA LALONDE,

Plaintiff – Appellant

v.

CHRISTUS HEALTH TEXAS OCCUPATIONAL INJURY ASSISTANCE
PLAN; CHRISTUS HEALTH,

Defendants – Appellees

Appeal from the United States District Court
for the Southern District of Texas
No. 4:12-cv-1752

Before KING, DAVIS, and ELROD, Circuit Judges.

PER CURIAM:*

Patrizia Lalonde appeals the district court's order granting summary judgment in favor of Christus Health Texas Occupational Injury Assistance Plan in this Employee Retirement Income Security Act case. Because there is substantial evidence in the record to support the denial of benefits, we AFFIRM the judgment of the district court.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-20477

## I.     Factual and Procedural Background

Patrizia Lalonde is a registered nurse and was employed by Christus St. Michael Health System in Texarkana, Texas. Throughout her employment, Lalonde was covered by the Christus Health Texas Occupational Injury Assistance Plan ("the Plan"). The Plan provides a number of benefits, including Wage Replacement Benefits ("WRB"), which are payable to a Plan participant who is temporarily totally disabled[1] due to an injury that occurred in the course and scope of employment. On May 22, 2010, Lalonde injured her back at work while lifting an overweight patient. The injury was promptly reported to the Plan, and the Plan arranged for Lalonde to receive medical care from Mark Gabbie, M.D., an Approved Physician.[2]

Dr. Gabbie first saw Lalonde on May 26, 2010. He noted that Lalonde had tenderness, swelling, and muscle spasms, but she had no radicular signs or symptoms. Dr. Gabbie diagnosed her with a lumbosacral strain, sacroiliac strain, and muscle spasms. He prescribed medication and ordered physical therapy three times a week for two weeks. He further recommended that she perform only light duty work, with specific postural limitations, and stated

---

[1] "Temporarily totally disabled" is defined by the Plan as:

Medically demonstrable anatomical or physiological abnormality caused by an injury, and commencing within six months from the date of injury that—

(a)    causes the Participant to be unable to perform the normal duties for which he or she was employed;

(b)    causes the Participant to be under the regular care of an Approved Physician; and

(c)    causes the participant to be unable to engage in Transitional Duty or any other occupation for wage or profit.

[2] The Plan defines "Approved Physician" as "a person duly licensed under Texas law as a Doctor of Osteopathy or Medical Doctor and either expressly approved by the Plan Administrator, included on an approved list . . . , or otherwise approved in writing by the Plan Administrator upon the request of a Participant."

2

that he would re-evaluate Lalonde's condition after physical therapy. The Plan authorized her physical therapy.

On June 16, 2010, Lalonde returned to Dr. Gabbie, and he opined that the physical therapy had exacerbated her pain. Dr. Gabbie noted radicular pain and burning in her right leg. He diagnosed her with sciatica, lumbosacral strain, and radiculopathy; ordered an MRI; and recommended that she remain on light duty work.

The MRI, performed on June 23, 2010, revealed that Lalonde had severe multilevel degenerative disease; that disc protrusions and posterior element hypertrophy from T12-L1 through L2-L3 caused significant AP canal stenosis; and that she had mild to moderate canal stenosis at L3-L4.

On July 21, 2010, Lalonde saw Dr. Gabbie for a third time and complained of continued pain and mild incontinence. Dr. Gabbie recommended to the Plan that Lalonde be evaluated by Marc Smith, M.D., a neurosurgeon, and that she receive steroid injections in her back. Dr. Gabbie diagnosed Lalonde with "lumbar spine stenosis" and recommended that she continue on light duty. Dr. Gabbie's records from this visit are silent as to whether Lalonde's pain was caused by her May work injury.

On July 28, after receiving Dr. Gabbie's recommendation, the Plan sent Lalonde's file to Ken Ford, M.D., an Approved Physician, for an evaluation of Lalonde's pre-existing condition. Dr. Ford believed that there was no objective, verifiable evidence of an injury resulting from the May incident, nor of any aggravation of a pre-existing condition. He stated that the MRI showed only "incidental, pre-existing multilevel degenerative changes," with no "acute changes" as a direct result of the work incident. He concluded that, based on the documentation, Lalonde "at most, may have experienced some soft tissue muscle strain" requiring one or two clinic visits and some over-the-counter medications.

During this period, Lalonde continued to request medical treatment under the Plan. She contacted her designated Plan adjuster to obtain authorization for a visit to Dr. Smith, but she was told that Dr. Smith was not an Approved Physician. According to Lalonde's affidavit, the adjuster directed her not to act until she received instructions from the Plan. She claims to have placed numerous calls to the adjuster over a five-day period in early August 2010, but her calls went unanswered. During this time, Lalonde also requested authorization from the Plan to return to Dr. Gabbie for further treatment, but the Plan denied permission.

On August 9, 2010, Lalonde was sent home from work by her supervisor because she was in "no condition" to work. Since she had not received authorization from the Plan for further medical care, she claims that she had no choice but to seek outside medical care. On August 12, 2010, she was treated by Ronald Rush, M.D., a non-Approved Physician. Lalonde complained of pain in her lower back and minimal relief from the medications prescribed by Dr. Gabbie. Dr. Rush examined Lalonde and diagnosed her with hypertension, sinusitis, allergic rhinitis, peripheral neuropathy, and back pain. He reviewed her MRI and noted that she had moderate canal stenosis, secondary to disc protrusion. Dr. Rush referred Lalonde to a neurosurgeon for a consultation on the treatment of her back pain and spinal stenosis. Although Dr. Rush's examination notes do not discuss Lalonde's ability to work, Dr. Rush signed a slip stating that Lalonde would "be able to return to work/school on 8-26-2010 . . . [with] No Restrictions."

The same day that Lalonde saw Dr. Rush, the Plan denied Dr. Gabbie's neurosurgical referral as well as his request that Lalonde receive steroid injections, stating that there was no objective evidence of radiculopathy. The denial was based upon Dr. Ford's peer review of Lalonde's medical records.

4

No. 13-20477

Lalonde filed a claim for WRB as of August 12, 2010, alleging temporary total disability. On August 20, 2010, Lalonde wrote to the Plan protesting the denial of Dr. Gabbie's referral. She claimed that she was in pain, Dr. Rush had removed her from work, and she was incapable of performing light duty work. She further stated that, after receiving no response from the designated Plan adjuster, she had no choice but to seek treatment outside the Plan. She attached records from Dr. Gabbie in support of her claim.

On August 25, 2010, the Plan requested that Lalonde undergo an Independent Medical Exam ("IME") by an Approved Physician. It also asked Lalonde to furnish copies of her medical records from Dr. Rush within ten days in order to assist with the IME.

On August 26, 2010, Lalonde returned to Dr. Rush for a follow-up visit. Dr. Rush signed a slip similar to the one signed on August 12, confirming that he had seen Lalonde, and she would "be able to return to work/school . . . after Eval. [with] No Restrictions," stating "Excuse pt. til release by Dr." The slip contains no additional information. Lalonde reported to Dr. Rush that she still suffered from back pain, but Dr. Rush's examination notes contain no additional details about her back's condition. Several weeks later, Dr. Rush referred Lalonde to a neurosurgeon, Zachary Mason, M.D. Dr. Rush also ordered an electrodiagnostic examination, which was performed on October 8, 2010.

Throughout this period, Lalonde's counsel corresponded with the Plan, questioning the need for an IME and updating the Plan on Dr. Rush's treatment of Lalonde. On October 12, 2010, the Plan informed Lalonde's counsel that it would not pay WRB based on Rush's work releases, because there was "no additional narrative or diagnostic medical evidence" to support the opinion. The Plan informed Lalonde that it required an assessment by an Approved Physician to award WRB and that Lalonde's WRB claim "remain[ed]

No. 13-20477

suspended pending receipt of Dr. Rush's medical records and completion of the [IME]."

On November 16, 2010, Lalonde saw Dr. Mason. Dr. Mason noted that Lalonde's MRI from June 2010 showed multiple disc herniations, and she reported numbness in her right leg and foot, difficulty controlling urination, and pain reported as seven on a scale of one to ten. He observed that Lalonde had difficulty standing erect and walked in flexed position. Dr. Mason concluded that Lalonde would likely require surgical intervention and ordered a follow-up MRI. He did not address Lalonde's ability to work. The second MRI ultimately showed herniated discs at T12-L1, L1-L2, and L2-L3 resulting in moderate canal stenosis; mild chronic compression at T11; and minimal grade-one spondylolisthesis at L4-L5 due to facet degeneration.

On February 8, 2011, Lalonde saw Richard L. Weiner, M.D., an Approved Physician, for an IME. Dr. Weiner reviewed both MRIs and Dr. Mason's opinion and recommendation for back surgery. Dr. Weiner also conducted a neurological examination on Lalonde. He opined that Lalonde had multilevel degenerative lumbar disc disease, a large left paracentral T12-L1 disk herniation, a broad-based disc protrusion at L1-L2, and a central disc protrusion at L2-L3. He believed that Lalonde did "not appear to have neurologic damage," but she should undergo an examination for "possible neurogenic bladder" given her incontinence. He also noted that she exhibited symptoms related to a chronic degenerative spinal condition and that the effects of lifting a heavy patient may have exacerbated her condition and caused one or more of the disc herniations. However, he did not think that Lalonde had reached "maximum rehabilitative capacity" and additional testing was needed, such as a CT myelogram scan, in order to evaluate the instability in Lalonde's lumbar spine and the relation between the instability and the herniated discs, spinal cord, and nerve roots. Dr. Weiner's report did not

6

No. 13-20477

address or render any opinion regarding Lalonde's ability to work, despite the Plan having sent Lalonde to him for purposes of determining eligibility for benefits.

Following Lalonde's visit to Dr. Weiner, the Plan sent Lalonde's medical records to William E. Blair, Jr., M.D., for review. Dr. Blair issued a report on March 4, 2011, opining that there was no objective evidence to support new physical damage from the May 22 incident and no evidence of neurological deficiencies. He believed that further treatment or a "workup" was not medically necessary as a result of the May 22 incident.

On March 22, 2011, more than six weeks after the appointment with Dr. Weiner, the Plan authorized Dr. Weiner's request that Lalonde receive a CT myelogram of her lumbar spine. The Plan scheduled an examination and informed Lalonde, but Lalonde refused to attend on the grounds that it was a risky procedure and that no doctor had discussed it with her. Lalonde's counsel contacted the Plan and requested the name of the doctor who had ordered the CT myelogram. A month later, Lalonde spoke with Dr. Weiner's nurse practitioner about the test but still ultimately refused to undergo the CT myelogram.

On May 2, 2011, the Plan denied Lalonde's claim for WRB. The letter explained the Plan's basis for its decision to deny benefits as follows:

> [T]here is insufficient medical evidence from an Approved Physician to support your client's [WRB] claim. The Plan will only pay [WRB] due to a disability that is solely and directly related to the work injury. With your client's documented degenerative and arthritic conditions that overlay the possible work related component, there is lack of medical documentation from an Approved Provider supporting the requested period of disability.

On September 26, 2011, Lalonde appealed the decision of the Plan. The Appeals Committee informed Lalonde that it would require an additional IME before deciding her appeal. On October 24, Lalonde refused to submit to the

additional IME on the ground that an IME conducted in November 2011, a year and a half after her injury, would not be beneficial in determining whether she was eligible for benefits from August 12, 2010, to April 25, 2011. She believed that the request that she undergo an additional IME was harassment. Additionally, she stated that she could not afford to travel once more from Texarkana to Dallas. However, she agreed to attend an IME in Texarkana or travel to Dallas if the Plan paid her travel expenses, and if the Plan provided a sufficient reason for the exam.

On November 4, 2011, the Plan stated that the IME had been canceled based on Lalonde's refusal and that, because the WRB claim involved an issue of medical judgment, the Plan was required to consult a health care professional who was not consulted as part of the initial claim. The Plan thus submitted Lalonde's claim to Mitchell Brooks, M.D., for a peer review. Dr. Brooks, an orthopedic surgeon, completed his review on November 23, 2011. Based on the diagnostic testing, the medical records from Drs. Gabbie, Ford, and Weiner, as well as those from the non-Approved Physicians, Drs. Rush and Mason, Dr. Brooks concluded that the extent of Lalonde's at-work injury "was, at most, a soft tissue sprain/strain." He also opined that, giving Lalonde the "broadest benefit of the doubt," Lalonde required no more than ten sessions of physical therapy, over-the-counter medications, and two follow-up appointments to treat her injury. Lalonde would have achieved maximum rehabilitative capacity at six to eight weeks after the injury, "with or without treatment." According to Dr. Brooks, the injury would have required a maximum of one or two days off work, with some form of modified duty for six to eight weeks. However, other than these restrictions, Dr. Brooks stated that there was "no evidence that this patient was disabled due to her injury from any gainful employment subsequent to 5/22/10."

Dr. Brooks's report also addressed the findings in the MRIs. He believed that the "documented objective clinical findings" did not demonstrate "the presence of any injury to the structure of the lumbar spine and/or the discs and any aggravation, enhancement or acceleration of this patient's previously existing condition." He clarified that the initial MRI of Lalonde's lumbar spine did not indicate the presence of an acute injury in anatomical structures and that, if such injury had existed, "one would expect to have found swelling in the musculature and in the soft tissue surrounding the lumbar spine."

On December 16, 2011, the Appeals Committee issued a final denial of Lalonde's claim. The Appeals Committee decided that WRB were not payable because no Approved Physician had ever decided that Lalonde was temporarily totally disabled. It also mentioned that Lalonde had refused the CT myelogram requested by Dr. Weiner. The Appeals Committee relied on Dr. Brooks's opinion that Lalonde's at-work injury was, at most, a soft tissue strain or sprain and that such injury would require no more than ten physical therapy sessions and one or two days off of work.

On June 11, 2012, Lalonde filed this suit under the Employee Retirement Income Security Act ("ERISA"), challenging the denial of her claim for WRB for the period from August 12, 2010, through April 25, 2011. The parties filed cross-motions for summary judgment, and the district court entered summary judgment in favor of the Plan. The district court held that there was substantial evidence in the record to support the Plan's determination. Lalonde timely appealed.

## II.    Standard of Review

We review de novo the district court's conclusion that an ERISA plan administrator did not abuse its discretion in denying disability benefits. *Crowell v. Shell Oil Co.*, 541 F.3d 295, 312 (5th Cir. 2008). Under this approach, we review the plan administrator's decision from the same

perspective and with the same standard of review as the district court. *Anderson v. Cytec Indus.*, 619 F.3d 505, 512 (5th Cir. 2010). When a benefits plan's terms grant the plan administrator discretionary authority to determine eligibility for benefits or construe the terms of the plan, which it does here, we review the determination to deny benefits for abuse of discretion. *Id.* We will affirm a plan administrator's determination to deny benefits if it is "supported by substantial evidence and is not arbitrary or capricious[.]" *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004). "Substantial evidence is 'more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Deters v. Sec'y of Health, Educ. & Welfare*, 789 F.2d 1181, 1185 (5th Cir. 1986)). "The fact that the evidence is disputable will not invalidate the decision; the evidence need only assure that the administrator's decision falls somewhere on the continuum of reasonableness—even if on the low end." *Porter v. Lowe's Cos., Inc.'s Business Travel Accident Ins. Plan*, 731 F.3d 360, 363–64 (5th Cir. 2013) (internal quotation marks and footnote omitted).

### III.   Denial of Benefits

Lalonde claims that the Plan abused its discretion in denying her WRB based on her at-work injury. Specifically, she asserts that the Plan "ignored its obligations" by refusing to send Lalonde to Approved Physicians. Thus, Lalonde concludes that the Plan's decision is not supported by substantial evidence because it "prevented any evidence from coming into existence by refusing to send Lalonde to a Plan Approved Physician." In support of her claim that the Plan prevented her from generating a complete record, Lalonde points to the Plan's denial of Dr. Gabbie's neurosurgeon referral and recommendation for steroid injections. She also claims that she attempted to return to Dr. Gabbie in August 2010, but the Plan ignored her request.

No. 13-20477

Lalonde concedes that no Approved Physicians concluded that she was temporarily totally disabled, but she contends that the lack of evidence on this point is the direct result of the Plan's behavior. Additionally, Lalonde argues that the Plan relied on reports from doctors who had not physically examined her, rendering its decision arbitrary and capricious.

Despite Lalonde's claims that the Plan denied her access to doctors, inhibiting the development of a complete and accurate record, she offers no legal support for the proposition that the Plan has an obligation to send her to multiple doctors for this purpose. Additionally, the record does not support her claim that she was prevented from seeing Approved Physicians. First, Lalonde received immediate medical care from Dr. Gabbie following her injury, and she returned for two additional follow-up visits and underwent an MRI. For more than a year, the Plan continued to send her to additional physicians and for diagnostic testing. Although the Plan's responses to her requests were less than prompt, the Plan did not prevent her from developing the medical record with evidence of her condition. There are multiple evaluations from physicians in the record as well diagnostic reports.

Second, the Plan provided specific reasons for its refusal to send Lalonde to the neurosurgeon suggested by Dr. Gabbie and its denial of coverage for the cortisone injections. In a letter dated August 12, 2010, the Plan explained that, based on Dr. Ford's review of Lalonde's medical records, neither the neurosurgeon consultative examination nor the injections were medically necessary. The Plan's decision was not a blanket denial with no support; it was based on the opinion of a medical professional.

Third, Lalonde refused two opportunities to further develop the medical record. She refused to undergo the CT myelogram, which would have assisted the Plan in determining whether her herniated discs were related to her degenerative condition or whether they were the result of her at-work injury.

She also refused to attend the IME scheduled by the Appeals Committee, which is what prompted the Plan to send her file to Dr. Brooks for a peer review. Lalonde cannot claim that the Plan was thwarting her attempts to develop the record, but then refuse to participate in the record's development.

Having concluded that the Plan did not prevent Lalonde from attaining medical evaluations and developing the record as to the extent of her medical impairments, we turn to Lalonde's main claim—that the Plan's decision was not supported by substantial evidence. We agree with the district court that there is sufficient evidence in the record to support the Plan's determination that Lalonde was not temporarily totally disabled and, therefore, ineligible for benefits. Dr. Brooks reviewed the medical record, including the notes from physicians who treated Lalonde, their evaluations, and reports from diagnostic tests, and Dr. Brooks concluded that Lalonde had at most a soft tissue strain.[3] Dr. Brooks's opinion is also consistent with other evidence in the record, including the evaluations by Drs. Weiner, Ford, and Blair, and the two MRIs, which indicated that Lalonde's back problems were degenerative in nature. While only Dr. Weiner physically evaluated Lalonde, ERISA plan administrators may rely on a wide variety of medical evidence in making a decision, including evaluations from physicians who did not evaluate the claimant in person. *Cf. Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 232 (5th Cir. 2004); *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003) (explaining that nothing in ERISA "suggests that plan administrators must accord special deference to the opinions of treating physicians."). Collectively, this constitutes substantial evidence.

---

[3] Lalonde argues for the first time on appeal that Dr. Brooks's evaluation should not serve as substantial evidence because he never physically examined her and his opinion conflicts with the objective medical evidence. However, we do not consider arguments raised for the first time on appeal. *See Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 342 (5th Cir. 1999).

No. 13-20477

## IV.  Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.