**Steven D. SINGLEY Plaintiff**

v.

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY and Halliburton Company Defendant.**

**No. 2:06 CV 54KS MPT.**

United States District Court,
S.D. Mississippi,
Hattiesburg Division.

June 6, 2007.

Percy Watson, Hattiesburg, MS for Plaintiff.

Steven H. Begley and Kevin A. Rogers, Jackson, MS, for Defendants.

### MEMORANDUM OPINION AND ORDER

STARRETT, District Judge.

This cause is before the court on a joint motion for summary judgment filed by defendants Hartford Life & Accident Insurance Company ("Hartford") and Halli-

burton Company ("Halliburton"). From its review of all matters made a part of the record of this case as well as applicable law, and being thus fully advised in the premises, the court FINDS that the motion is well taken and should be granted. The court specifically finds as follows:

### FACTUAL BACKGROUND [1]

Plaintiff Steven D. Singley was employed as a service supervisor for Halliburton for 23 years. While at Halliburton, plaintiff was a participant in an employee welfare benefit plan established, maintained and administered by Hartford (the "Plan") and funded by a Group Long Term Disability Insurance Policy No. GLT–043199 issued by Hartford to Halliburton (the "Policy").

The Policy provides that a participant is eligible to receive long-term disability benefits under the following conditions:

1. you become Disabled while insured under this plan;

2. you are Disabled throughout the Elimination Period; [2]

3. you remain Disabled beyond the Elimination Period;

4. you are, and have been during the Elimination period, under the Regular Care of a Physician; and

5. you submit proof of loss satisfactory to [ ] Hartford.

Under the Policy, the terms "Disability" and "Disabled" are defined as follows:

"(1) during the Elimination Period;

(2) and for the next 12 months you are prevented by:

    (a) accidental bodily injury;

    (b) sickness;

    (c) mental illness;

    (d) substance abuse; or

    (e) pregnancy,

from performing one or more of the Essential Duties [3] of your Own Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre–Disability Earnings.

Thereafter, you must be so prevented from performing one or more of the Essential Duties of Any Occupation."

"Any Occupation" means an occupation for which the employee is qualified by education, "training or experience" and which "has an earnings potential greater than the amount equal to 60% of [the employee's] Indexed Pre–Disability Earnings."

The Policy specifies that Hartford will cease benefit payments on "the date you are no longer Disabled as defined."

Plaintiff's last day of employment with Halliburton was February 20, 2001. After being off from work for several months, plaintiff completed an application for long-term disability benefits on or about September 21, 2001, on the basis that he was disabled from severe chronic lower back pain with pain and weakness of the right leg and foot associated with a laminectomy [4] in 1999. In support of plaintiff's ap-

---

**1.** These facts are taken from the Policy and Mr. Singley's claim file, duly authenticated by the affidavit of David J. Cohen (Exhibit D to the motion for summary judgment).

**2.** The Elimination Period is the "period of time you must be Disabled before benefits become payable. It is the last to be satisfied of the following: 1. the first six consecutive months of any period of Disability; or 2. with the exception of benefits required by state law, the expiration of any Employer spon-

sored short term disability benefits or salary continuation program."

**3.** " 'Essential Duty' means a duty that (1) is substantial, not incidental; and (2) is fundamental or inherent to the occupation; and (3) can not be reasonable [*sic*] omitted or changed."

**4.** A laminectomy is a surgical procedure on the spine whereby the posterior arch of a

plication for long-term disability benefits, he included an attending physician's statement ("APS") completed by Dr. Holly Fink, his treating chiropractor, on September 4, 2001. According to the APS, plaintiff's primary diagnosis was a bulging lumbar disc (L4) with a secondary diagnosis of subluxation of lumbar discs (L4–5) with sciatica, and the plaintiff had subjective symptoms of "pain in lower back that radiates down right leg."

Hartford requested additional medical records from Dr. Fink but no additional medical records were submitted.[5]

Plaintiff's claim form also indicated that he had been seen by Dr. Russell Blaylock, a neurosurgeon, in October of 2000. Accordingly, Hartford requested medical records from Dr. Blaylock's office. According to these records, Dr. Blaylock had seen the plaintiff on two occasions—October 30 and 31, 2000. On October 30, 2000 Dr. Blaylock made the following diagnosis: "It sounds like he has an extruded disc on the right side which appears to involve the upper nerve roots, L3 or L4 or L5. I plan to get an MRI scan with gadolinium enhancement to see what that shows and see him back after we get the results." The MRI recommended by Dr. Blaylock was performed on October 30, 2000 by Dr. Barry McCay, a radiologist. The MRI revealed that "[n]o HNP [slipped disc] or spinal stenosis is identified and the remainder of the study reveals no abnormality." Dr. McCay's impression was: "Degenerative disease and previous surgery as described above without evidence of the MRI."

Hartford approved Mr. Singley's application for long-term disability benefits on December 7, 2001, effective September 21, 2001.

In February, 2002, Mr. Singley was referred by Hartford to Vocational Rehabilitation at Concentra Managed Care Services, Inc. On March 19, 2002, Concentra closed Mr. Singley's file, noting that information received from Dr. Fink "indicates that Mr. Singley is unable to return to gainful employment."

Since the initial approval of his application for long-term disability benefits, Hartford continued to request, and Mr. Singley provided, periodic updates on his medical condition. Plaintiff submitted a questionnaire to Hartford dated March 2, 2002, in which he indicated that his medical condition was "[l]ower back pain with numbness in right leg. Hurts to stand, sit, walk or drive." Plaintiff indicated that his condition had changed in the past eighteen months and that his back pain was worse.

Dr. Fink completed an APS on March 6, 2002. According to the APS, Dr. Fink found that the plaintiff continued to suffer from lumbar and sciatic nerve problems and disc displacement, with subjective symptoms of moderate to severe pain from lumbar vertebrae into the legs. In her APS, Dr. Fink indicated that plaintiff had severe pain into his right leg if he stood for more than twenty minutes, pain in his right leg if he sat for more than ten to fifteen minutes, was limited to carrying ten to fifteen pounds, was very limited in reaching overhead, was limited to pushing/pulling five to ten pounds, was very limited driving, and was limited to no bending or repetitive twisting. Dr. Fink opined that plaintiff was physically unable to return to light duty work. Dr. Fink also completed a Physical Capacities Evaluation ("PCE") on March 6, 2002. According to the PCE, Dr. Fink found that plain-

---

vertebra is removed. *Stedman's Medical Dictionary* 222280 (27th ed.2000).

5. Hartford requested medical records from Dr. Fink in letters dated October 3, 2001, October 26, 2001, November 30, 2001 and December 29, 2001.

tiff could do zero hours of sitting, standing, walking or driving. Dr. Fink indicated that plaintiff could only occasionally lift/carry or push/pull one to ten pounds, could never climb, balance, stoop, kneel, crouch, crawl or reach below waist level, that he could only occasionally reach above shoulder and at waist level, and could not use his feet repetitively, although he could use his hands repetitively. Dr. Fink determined that plaintiff's condition was permanent, he had reached maximum medical improvement and he could not return to his regular occupation.

Mr. Singley then applied for Social Security disability benefits. Initially, his claim had been denied on January 11, 2002 because the Social Security Administration ("SSA") determined that although he could not perform his previous work, he was able to perform other work. Plaintiff's motion to reconsider was denied by the SSA on February 15, 2002. After an appeal and a hearing before an administrative law judge, the SSA issued a fully favorable decision to the plaintiff on November 22, 2002, finding that Mr. Singley was disabled under their rules as of February 25, 2001 and awarding him disability benefits.[6]

On December 28, 2002, Dr. Fink faxed to Hartford copies of the March 6, 2002 APS and PCE forms, indicating on those forms that there had been no changes as of December 27, 2002. Thereafter, Hart-

ford wrote to Dr. Fink on January 9, 2003, requesting information regarding Dr. Fink's current treatment of the plaintiff. Hartford also requested Dr. Fink's opinion as to how many hours a day the plaintiff could work, if he were allowed to shift positions.[7] Dr. Fink did not respond to the letter, so Hartford sent follow-up letters again on March 3, 2003 and March 28, 2003. In response to the letters, Dr. Fink sent notes from plaintiff's chart, dated March 11, 2003, where she stated that the plaintiff "continues to have post laminectomy syndrome which causes him to have days of sever[e] discomfort to days that he may have mild to moderate discomfort." She indicated that Mr. Singley had a very limited range of motion and was in pain constantly. She also indicated that on mild to moderate days (one to two days per week, on average), plaintiff could sit for one hour, stand for about two minutes, walk for ten to fifteen minutes, and drive for five to ten minutes. However, she stated that on severe days (four to five days per week, on average), plaintiff could only sit for five to ten minutes, was unable to walk or drive, and suffers from severe pain in his leg when standing. She indicated that there were no days when Mr. Singley was pain free. Dr. Fink did not respond to Hartford's question as to how many hours Mr. Singley could possibly work if allowed to change positions.

6. Under the SSA, "disabled" or "disability" means "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." The administrative law judge first found that Mr. Singley lacked the "residual functional capacity to perform the requirements of any past relevant work." Then, the judge found that the SSA failed to meet its burden of showing that there were other jobs he could perform, as the judge found that Mr. Singley could "perform the demands of no

more than a markedly reduced range of sedentary work" and that he did not have skills transferable to a sedentary occupation.

7. The reason for this was because in the December 30, 2002 PCE, Dr. Fink indicated that in an eight-hour day, Mr. Singley could sit/stand/walk or drive for 0 hours, but she also commented that Mr. Singley was "in pain 24–7 b/c of this he is constantly having to shift positions from sitting, standing & laying." Accordingly, Hartford asked Dr. Fink: "From this statement, in an 8–hour day, if Mr. Singley could shift positions when needed, how many hours a day could he do?"

On March 27, 2003, Hartford wrote to Mr. Singley informing him that as of September 20, 2003, he would need to be considered to be totally disabled pursuant to the Policy, in order to continue receiving disability benefits. Hartford requested additional documentation in conjunction with its investigation.[8]

Plaintiff completed and submitted a questionnaire dated April 8, 2003, in which he described his work history and education. Plaintiff had a high school education and had worked as a marine service operator for nearly twenty-three years. Dr. Fink submitted an APS dated April 8, 2003, containing the same primary diagnoses as set forth in her previous APS and finding that plaintiff suffered from lumbar and sciatic nerve problems and disc displacement, with subjective symptoms of moderate to severe pain from lumbar vertebrae into the legs. Dr. Fink also submitted a PCE dated April 8, 2003, essentially providing the same limitations as set forth in her previous PCE: plaintiff was limited to occasionally lifting/carrying and pushing/pulling one to ten pounds; could never climb, balance, stoop, crouch, or crawl; could occasionally kneel and reach above shoulder and reach at waist level; and could never reach below waist level. Further, while plaintiff could not use his right foot repetitively, he could repeatedly use his left foot and his hands. Dr. Fink concluded that plaintiff could not return to work in a lighter duty capacity.

As part of its investigation, Hartford referred the plaintiff's medical file to Crystl Carleton, a registered nurse and a Clinical Case Manager at Hartford, for review. On October 6, 2003, Ms. Carleton completed her review of the plaintiff's claim, noting the plaintiff's medical history and the most recent restrictions that had been provided by Dr. Fink. Ms. Carleton concluded:

> [Employee] with longstanding back problems who continues to treat with only a chiropractor for palliative pain relief provided by medication and spinal manipulation. Restrictions appear to be severe for condition. Since [employee] has not pursued care by an orthopedist or neurosurgeon, it is not clear exactly what the status of his medical condition is as well as what current functionality is. I would recommend an IME [independent medical evaluation] by an orthopedist to evaluate current medical problems and current functionality.

Hartford then requested an independent medical review from Dr. Barry Turner, a board-certified orthopaedic surgeon with the University Disability Consortium.[9] Dr. Turner's report, dated October 29, 2003, showed that he reviewed plaintiff's medical records, including Dr. Blaylock's treatment notes, the October 2000 MRI results and records from Dr. Fink, and he also spoke with Dr. Fink regarding plaintiff's physical condition. In their conversation, Dr. Fink admitted to Dr. Turner that there was no objective evidence of neurological impairment and that plaintiff had refused orthopedic or neurosurgical follow-up. She further indicated that plaintiff could be magnifying his symptoms; however, she maintained that in her opinion, plaintiff was unable to work. Dr. Turner recounted:

> My conversation with Dr. Fink indicated that she is really limiting him from

---

8. On September 22, 2003, Hartford wrote to Mr. Singley informing him that they were still investigating his claim and that because of the delay, they would continue his disability benefits pending the completion of the investigation.

9. The University Disability Consortium is an independent company that contracts with practicing specialists to assess medical evidence and determine patients' functionality.

working based upon his own self-reported complaints. She said that he has allowed himself to deteriorate to a severely deconditioned status of health, and there is no way he could return to work now unless he underwent rehabilitation or work hardening. She said she is still of the opinion that he suffers from sciatic nerve entrapment, however there is no proof of such with a normal MRI which showed degenerative changes only and no evidence of herniated disc or nerve root compression. There are no physical findings to substantiate any objective evidence of entrapment. Since he magnifies his symptoms and possibly self limits his effort, it appears that his symptoms likely are not credible. He has refused to comply with her orders to visit an orthopedic surgeon or a neurosurgeon within the last several years.

Dr. Turner concluded: "Therefore, following my conversation with Dr. Fink, and my review of the records, which indicated no evidence of objective impairment and no evidence of abnormalities on the MRI studies, it is my opinion that there is no evidence to support impairment." [10]

On October 31, 2003, for the first time in nearly three years, Mr. Singley had an MRI conducted.[11] The MRI report revealed the following: partial collapse of the L3–4 Disc; L4–5 and L5–S1 Annular Fissures and Small Posterior Annular bulges; and Partial Hemilaminectomy Defect at L3–4 on the right. The results found normal alignment, normal conus and nerve roots, "[n]o signs of disc extrusion or significant protrusion" and "[n]o significant central canal stenosis."

Because Drs. Fink and Turner disagreed as to plaintiff's work capacity, Hartford sought another IME. Hartford initially contacted Dr. Leslie V. Rush, a physical medicine and rehabilitation physician. On February 2, 2004, Hartford cancelled the appointment with Dr. Rush [12] and contracted instead with Dr. Thomas Blake, an orthopedic surgeon, for an IME of Mr. Singley. Mr. Singley was examined by Dr. Blake on March 8, 2004. Dr. Blake also reviewed the results of the 2000 MRI and spoke with Dr. Fink. Dr. Blake diagnosed plaintiff's condition as post laminectomy syndrome. He found that plaintiff was capable of working for a maximum of eight hours per day with the restrictions that he could sit for half an hour at a time for six hours of the day; drive for half an hour at a time over two hours of the day; stand for fifteen minutes at a time over two hours of the day; and walk for fifteen minutes at a time over two hours of the day. Dr. Blake also concluded that plaintiff could occasionally lift/carry one to ten

**10.** On October 29, 2003, Dr. Turner faxed to Dr. Fink his summary of their conversation for any changes or comments. Dr. Turner did not receive a response from Dr. Fink.

**11.** Hartford contends that it was not aware that the MRI had been performed until it received a copy of the test results from plaintiff's counsel on November 22, 2004. Plaintiff has provided no evidence to the contrary, although he speculates that Hartford was aware of the MRI—and indeed, that the MRI was performed at Hartford's request.

**12.** The notation in Hartford's records addressing this cancellation states: "S. called to say that IME physician [Dr. Rush] wanted to order an FCE [functional capacity evaluation]. Since EE [employee] is being treated by a DC [doctor of chiropractic medicine] and [currently does] not have anyone who can write an Rx [prescription], asked to find another MD. 2/10/04 appt. has been cancelled and they are looking for another examiner." Plaintiff speculates that there was something irregular or improper about the appointment being cancelled, while defendant avers that it was cancelled because in order to do a functional capacity evaluation, Dr. Rush required a prescription, and either Dr. Fink was not capable of writing one or Dr. Rush would not accept one from her.

pounds, occasionally push/pull eleven to twenty pounds, reach above his shoulder occasionally, reach at waist level constantly, and repetitively use his hands. Dr. Blake concluded that these restrictions were permanent and that no substantial improvement was expected. Dr. Blake further stated that plaintiff could return to work as of March 9, 2004, and that he "should be able to work within the limitations mentioned above which would essentially be office-type work where he did not have to lift substantially and did not have to sit in the same position constantly." [13] Dr. Blake's notes of the office visit as well as Hartford's records reveal that Dr. Blake requested permission from Hartford to take x-rays of plaintiff's lumbar spine. Hartford denied this request, explaining that it does "not authorize x-rays and review usually included record review and physical exam at time of IME."

On an April 8, 2004 claimant questionnaire, Mr. Singley described his current condition as "severe back and leg pain" and noted that his pain had gotten worse over the past eighteen months.

Hartford's Rehabilitation Clinical Case Manager, John S. Melendez, then performed an Employability Analysis on April 23, 2004, in order to determine the availability of sedentary occupations for which plaintiff was qualified. Based on plaintiff's education, training and experience, as well as the PCE form completed by Dr. Blake on March 8, 2004 and Dr. Turner's October 29, 2003 medical records review report, the Employability Analysis concluded that there were a number of sedentary

occupations for which the plaintiff was qualified, and which satisfied the earnings potential requirements under the Policy. [14]

On June 1, 2004, Clarissa Pimentel, Senior Examiner for Hartford in the Sacramento Disability Claim Office, wrote to plaintiff notifying him that he was no longer eligible to receive long-term disability benefits because he no longer met the definition of Disability under the Policy, and that his benefits would therefore be terminated on September 23, 2004. In reaching its benefit determination, Hartford relied on the evidence in the administrative record, which included: plaintiff's application for long-term disability benefits; Dr. Fink's September 4, 2001 APS; Dr. Fink's office notes from October 4, 2000 through December 2001; Dr. Turner's Independent Medical Review; Dr. Blake's IME; the Employability Analysis Report; and plaintiff's self-reported work history and education. Ms. Pimentel notified Mr. Singley of his right to appeal its determination and notified him that upon appeal they would review his entire file, including any additional information submitted with his appeal.

Plaintiff appealed the termination of his benefits through a letter from his attorney dated November 22, 2004, and submitted additional medical records. Specifically, plaintiff submitted: examination notes and reports by Dr. Michael Patterson [15] dated September 24, 2004, October 4, 2004, October 13, 2004 and November 1, 2004; an MRI report by Dr. Lance Faler, a radiologist, dated September 25, 2004; notes from Dr. Matthew Wallack regarding a lumbar epidural steroid treatment administered to Mr. Singley on October 18, 2004; [16] treatment notes from Dr. Fink

---

**13.** Dr. Blake's report was forwarded to Dr. Fink for her comment, but Hartford did not receive a response.

**14.** These occupations were: taxicab dispatcher, order clerk, addresser, telegraph service rater, call out operator, press clippings cutter and paster, microfilming document preparer,

weight tester, ink printer and dowel inspector.

**15.** The medical reports do not indicate Dr. Patterson's area of specialty.

**16.** In notes dated November 1, 2004, Dr. Wallack indicated that the injections had not been very helpful.

dated October 14, 2003 through October 5, 2004; and the October 31, 2003 MRI report. The September 25, 2004 MRI report found a mild degree of stenosis and indicated that the overall alignment of the plaintiff's lumbar spine was normal. The impressions were "[p]ostoperative change" and "[e]arly discogenic degenerative change without significant focal finding." Dr. Patterson's September 24, 2004 notes indicate that Mr. Singley stated his condition was deteriorating, noted that x-rays had shown that he had collapsed discs at L5–S1 and L4–5, and referenced the October 2003 MRI showing stenosis at L4–5.

After reviewing and considering these additional materials, Hartford affirmed its decision in a letter from David Cohen, a Benefit Management Services Appeal Specialist, on February 17, 2005. In his letter, Mr. Cohen stated that most of the new records "document symptoms reported by Mr. Singley approximately 4 months after the date LTD benefits were terminated in 6/1/04. They contain no new clinical or test findings which alter our determination that Mr. Singley was not functionally impaired from performing the duties of Any Occupation as of 6/1/04." Additionally, Cohen noted that the October 31, 2003 MRI predated the examination by Dr. Blake, who had concluded that plaintiff was capable of sedentary work, and that the September 25, 2004 MRI results "are characterized as mild and are not supportive of impairment from performing office type work." And Cohen also noted that Dr. Fink's treatment notes only "document routine bi-weekly chiropractic follow-up visits. They do not describe symptoms of such consistency and severity as to preclude Mr. Singley from performing the sedentary occupations identified on the employability analysis." In Mr. Cohen's opinion, the records from Drs. Fink and Patterson did not contain any "formal measurement of decreased strength or ranges of motion which would preclude

Mr. Singley from performing at a sedentary level." Mr. Cohen concluded by stating the following:

> While the information received supports Mr. Singley's inability to perform the duties of his own occupation as a Service Supervisor—including significant lifting, standing and walking—it does not support his functional impairment as of the date LTD benefits terminated on 6/1/04 from performing sedentary office type work with the restrictions outlined in the independent medical examination conducted by Dr. Blake. An employability analysis by The Hartford's vocational rehabilitation staff has identified a number of sedentary occupations prevalent in the general economy which Mr. Singley is physically and vocationally qualified to perform. Accordingly, the decision to terminate LTD benefits must be upheld.

Plaintiff thereafter filed suit in this court on February 15, 2006, specifically seeking relief under ERISA. Plaintiff avers in his complaint that he has been totally and permanently disabled since March 1, 2001 and seeks reinstatement of benefits, clarification of his rights to future benefits, costs, expenses and attorneys' fees. Plaintiff also seeks "state statute [sic] and injunctive and declaratory relief." Additionally, plaintiff seeks a monetary judgment against each defendant in the amount of $100,000.00 and demands a jury trial. Defendants jointly moved for summary judgment on November 15, 2006.

## ANALYSIS

### Applicability of ERISA

The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., exclusively governs (with certain exceptions not applicable here) "any employee benefit plan ... established or maintained ... by any employer engaged in

commerce or in any industry affecting commerce." 29 U.S.C. § 1003; *see also Hansen v. Continental Ins. Co.,* 940 F.2d 971, 976 (5th Cir.1991). An "employee welfare benefit plan" [17] is defined under ERISA as follows: "Any plan, fund or program ... established or maintained by an employer ... to the extent that such plan, fund or program was established or maintained by an employer ... for the purpose of providing to its participants or their beneficiaries ... benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1). The Plan in this case was established and maintained by plaintiff's employer, Halliburton, who is engaged in interstate commerce, for the purpose of providing its employees benefits, including benefits in the event of long-term disability. The Policy sets forth the benefits available, the intended participants and beneficiaries, and the appropriate procedures for submitting claims for benefits. The court finds (and the parties agree) that the Plan is an employee welfare benefit plan subject to ERISA. *See Meredith v. Time Ins., Co.,* 980 F.2d 352, 355 (5th Cir.1993); *Hansen,* 940 F.2d at 977; *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236, 240, 242 (5th Cir.1990), *reh'g denied,* 1990 U.S.App. LEXIS 13227 (July 16, 1990); *Davis v. AIG Life Ins.,* 945 F.Supp. 961, 966 (S.D.Miss.1995), *aff'd without opinion,* 85 F.3d 624 (5th Cir.1996).

*Exclusivity of ERISA/Preemption of State Laws*

■ Where a participant seeks to recover benefits under an employee welfare benefit plan, the exclusive remedy is provided by ERISA's civil enforcement mechanism. 29 U.S.C. § 1132; *see also Hudson v. Aetna Ins. Co.,* 2006 WL 463129, at *4 (S.D.Miss. Feb. 24, 2006) (*citing Hansen,* 940 F.2d at 979). 29 U.S.C. § 1132(a) provides, in pertinent part, as follows: "A civil action may be brought—(1) by a participant or beneficiary—(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

ERISA "supersede[s] any and all State laws [18] insofar as they may now or hereafter relate to any employee benefit plan...". 29 U.S.C. § 1144(a). The Supreme Court and this Circuit have broadly construed the phrase "relate to" as encompassing any state law that has a "connection with or reference to such a plan." *Ingersoll -Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990); *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983); *see also Kramer v. Smith Barney,* 80 F.3d 1080, 1083 (5th Cir.1996); *Smith v. Texas Children's Hosp.,* 84 F.3d 152, 154–55 (5th Cir.1996). Defendant argues that ERISA preempts any claims for relief asserted by the plaintiff not authorized under ERISA.[19] As noted earlier, in addition to its ERISA claim, plaintiff is seeking (unspecified) state statutory and injunctive and declaratory relief, and $100,000.00 from each defendant. Based on the foregoing authority, these claims for relief are preempted by ERISA.

*Standard of Review under ERISA*

Where a "benefit plan gives the administrator or fiduciary discretionary authority

---

**17.** Under ERISA, the term "employee benefit plan" or "plan" means "an employee welfare benefit plan." 29 U.S.C. § 1002(3).

**18.** State law is defined by ERISA to include "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c).

**19.** Plaintiff did not respond to this argument in its response to defendants' motion for summary judgment.

to determine eligibility for benefits or to construe the terms of the plan," this court is limited to reviewing its decision to limit or deny benefits under an abuse of discretion standard, rather than *de novo*. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111–15, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also Albert v. Life Ins. Co.*, 156 Fed.Appx. 649, 651–52 (5th Cir.2005) (citations omitted); *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 269 (5th Cir.2004), *cert. denied*, 545 U.S. 1128, 125 S.Ct. 2941, 162 L.Ed.2d 867 (2005); *Vega v. Nat'l Life Ins. Serv., Inc.*, 188 F.3d 287, 295 (5th Cir.1999).

■ Although Halliburton is listed in the Policy as the administrator, the Policy specifically provides: "Final interpretation of all provisions and coverage will be governed by the Group Insurance Policy on file with The Hartford at its home office." The Policy also states that a claimant must "submit proof of loss satisfactory to The Hartford" and that "the Hartford reserves the right to determine if your proof of loss is satisfactory." Nothing in the Policy grants any discretion to Halliburton to interpret the provisions of the Policy or to determine employees' eligibility for benefits. In light of this language (and noting that plaintiff does not contest this issue), the court finds that the Policy gives Hartford discretionary authority to determine plaintiff's eligibility for benefits. *See Goldman v. Hartford Life & Accident Ins. Co.*, 417 F.Supp.2d 788, 795 (E.D.La.2006), *reconsid. denied*, 2006 WL 861016 (Mar. 30, 2006) (concluding that language in same Plan and Policy at issue here gave Hartford discretionary authority to determine entitlement to benefits, even where employer (also Halliburton) is listed as plan administrator). Accordingly, this court will apply an abuse of discretion standard in reviewing Hartford's decision to terminate Mr. Singley's long-term disability benefits.[20]

Under the abuse of discretion standard, the court must uphold the administrator's decision if it is supported by substantial evidence and is not arbitrary and capricious. *Ellis*, 394 F.3d at 273; *Matney v. Hartford Life & Accident Ins. Co.*, 172 Fed.Appx. 571, 572 (5th Cir. Mar.27, 2006); *Albert*, at 652 (*citing Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 215 (5th Cir.1999)). "Substantial evidence" has been defined as "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ellis*, 394 F.3d at 269 (citations omitted). In other words, the administrator's decision must "fall [ ] somewhere on a continuum of reasonableness—even if on the low end." *Vega*, 188 F.3d at 297. Nevertheless, "[a]n administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial.' " *Matney*, 172 Fed.Appx. at 572 (citations omitted); *see also Lewis v. Unum Life Ins. Co.*, at 263 (5th Cir.2006). "A decision is arbitrary if there is no rational connection between the known or found facts and the evidence in the record." *Matney*, 172 Fed. Appx. at 572. It is important to keep in mind that "[t]he law requires only that substantial evidence support a plan fiduciary's decisions ... not that substantial evidence (or, for that matter, even a preponderance) exists to support the employee's claim of disability." *Ellis*, 394 F.3d at 273 (citations omitted).

---

**20.** This standard of review applies to an initial denial of benefits as well as to a termination of benefits after an initial determination of eligibility. *Matney v. Hartford Life &* *Accident Ins. Co.*, 172 Fed.Appx. 571, 572 (5th Cir. Mar. 27, 2006) (*citing Ellis*, 394 F.3d at 274).

818

A potential conflict of interest is also a factor in the abuse of discretion inquiry. *Matney,* 172 Fed.Appx. at 572–73. In this case, because Hartford insures the Policy and is also solely responsible for making benefits determinations, there is a potential conflict of interest because Hartford "potentially benefits from every denied claim." *Ellis,* 394 F.3d at 265; *see also Unum,* at 259–62. Therefore, the court must apply a "sliding scale standard" in reviewing Hartford's decision, meaning that the court must "give[ ] less deference to the administrator in proportion to the administrator's apparent conflict," and should be "less likely to make forgiving inferences when confronted with a record that arguably does not support the administrator's decision." *Vega,* 188 F.3d at 296, 299; *see also Matney,* 172 Fed.Appx. at 572–73. However, as there is no other evidence of a conflict other than Hartford's position as the insurer and also as the one determining eligibility for benefits, the court will afford Hartford's decision "only a modicum less deference" than it otherwise would. *Matney,* 172 Fed.Appx. at 573 (*citing Vega,* 188 F.3d at 301). "Under this standard, the basis for [Hartford's] decision must be supported by some concrete evidence in the administrative record." *Robinson v. Aetna Life Ins. Co.,* 443 F.3d 389, 395 (5th Cir.2006) (*quoting Vega,* 188 F.3d at 302).

*Application of Abuse of Discretion Standard*

As a threshold matter, the court notes that abuse of discretion is decided on the basis of information known to the administrator at the time he made the decision. *Salley v. E.I DuPont de Nemours & Co.,* 966 F.2d 1011, 1015 (5th Cir.1992). Therefore, in applying the abuse of discretion standard, the court is limited to the administrative record which "consists of relevant information made available to the administrator prior to the complainant's

filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Vega,* 188 F.3d at 300; *see also Matney,* 172 Fed.Appx. at 573; *Wildbur v. ARCO Chem. Co.,* 974 F.2d 631, 639 (5th Cir.1992), *reh'g denied,* 979 F.2d 1013 (Dec. 7, 1992); *Lewis v. CNA Group Life Assurance Co.,* 414 F.Supp.2d 652, 654–55 (S.D.Miss.2006). There is a narrow exception to this rule, allowing a court to look beyond the administrative record at "evidence...that assists...in understanding the medical terminology or practice related to a claim." *Albert,* at 652–53 (*citing Vega,* 188 F.3d at 299). Nevertheless, the Fifth Circuit has made it clear that "evidence may not be admitted in the district court that is not in the administrative record when that evidence is offered to allow the district court to resolve a disputed issue of material fact regarding the claim—*i.e.,* a fact the administrator relied on to resolve the merits of the claim." *Vega,* 188 F.3d at 289.

In its response to the motion for summary judgment, plaintiff submitted two affidavits—one from Dr. Fink and one from plaintiff—never submitted to Hartford and therefore not part of the administrative record. Dr. Fink's affidavit discusses the circumstances surrounding the October 31, 2003 MRI, and Mr. Singley's affidavit also discusses the circumstances surrounding that MRI, as well as the IME with Dr. Blake and Mr. Singley's current physical condition. The court agrees with defendants that these affidavits should be stricken, as they are not part of the administrative record and they do not fit the narrow exception set forth above. Accordingly, this court will restrict its analysis to the administrative record before Hartford.

Based on its review of the administrative record, as set forth more fully above, the court concludes that Hartford's decision that Mr. Singley was no longer

Disabled within the meaning of the Policy because he could perform certain sedentary work is supported by substantial evidence—namely, by Dr. Turner's conclusion that there was no objective evidence of impairment and by Dr. Blake's opinion that plaintiff should be able to perform office-type work,[21] as well as by the Employability Analysis which found that there were a number of sedentary-level occupations for which the plaintiff was qualified by education, training and experience.

In opposition to the motion for summary judgment, plaintiff points to the fact that neither the October 31, 2003 nor the September 25, 2004 MRI results were ever submitted to either Dr. Turner or Dr. Blake for their review.[22] It is true that Dr. Turner's review of Mr. Singley's medical records, which occurred a few days before the October 31, 2003 MRI, explicitly noted that his opinion was based on the lack of "evidence of objective impairment" and the lack of "evidence of abnormalities" on the October 2000 MRI that had been performed three years earlier. However, the MRI that was performed a few days after Dr. Turner's review, on October 31, 2003, found normal alignment, normal conus and nerve roots, "[n]o signs of disc extrusion or significant protrusion" and "[n]o significant central canal stenosis." And the subsequent September 25, 2004 MRI (performed after the date long-term disability benefits were terminated) found a mild degree of stenosis, indicated that the overall alignment of the plaintiff's lumbar spine was normal, and gave impressions of "[p]ostoperative change" and "[e]arly discogenic degenerative change without significant focal finding." Moreover, Doctor Blake, who physically examined plaintiff after the October 2003 MRI was conducted, concluded that plaintiff was capable of sedentary work.[23] Thus, based on these facts, as well as those set forth at length above in the factual background, the court finds that Hartford's decision to discontinue long-term disability benefits was supported by substantial evidence.

■ Plaintiff also points to the decision of the SSA granting disability benefits to Mr. Singley. However, Hartford was not required to defer to the SSA's decision and was entitled to reach its own independent conclusion as to Mr. Singley's eligibility for disability benefits, as long as that conclusion was based on substantial evidence.

21. Hartford was entitled to rely upon the opinions of Drs. Turner and Blake. Under ERISA, the plan administrator is not required to give deference to the opinion of a treatment physician. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Indeed, numerous courts have upheld administrators' decisions where the administrator chose to rely upon medical opinions from doctors other than treating physicians, even from doctors selected by the administrator to review the claim and even where those doctors did not personally examine the claimant. *See, e.g., Chandler v. Hartford Life*, 2006 WL 1209363, at * 4 (5th Cir.2006); *Vercher v. Alexander & Alexander, Inc.*, 379 F.3d 222, 231–33 (5th Cir.2004); *Dubose v. Prudential Ins. Co.*, 85 Fed.Appx. 371, 372 (5th Cir.2003); *Sweatman v. Comm'l Union Ins. Co.*, 39 F.3d 594, 602–03 (5th Cir.1994); *Noble v. Ingalls Shipbuilding*, 2006 WL 839519, at * 4 (S.D.Miss. Mar.29, 2006).

22. Although these documents were not part of the original record before Hartford when it made its initial decision to terminate benefits, they were submitted as part of the appeals process, and the June 1, 2004 letter to plaintiff informing him that his benefits were being terminated stated that he would be allowed to submit additional documentation on appeal. Therefore, these documents will be considered by the court.

23. Plaintiff's argument that "had Dr. Blake been permitted to conduct a more thorough and complete physical examination with the benefit of current diagnostic testing, he would have reached a different conclusion relative to [plaintiff's] ability to work" is pure specuation.

*Dubose v. Prudential Ins. Co.,* 85 Fed. Appx. 371, 372 (5th Cir.2003) (*per curiam*); *CNA,* at 659 n. 6; *Jones v. Lumberman's Mutual Cas. Co.,* 1995 WL 1945568, at *8 (N.D.Miss. Mar. 1, 1995); *Freeman v. Sickness & Accident Disability Plan of AT & T Techs., Ins.,* 823 F.Supp. 404, 416 (S.D.Miss.1993). The question for this court is whether there is substantial evidence in the administrative record (which includes, but is certainly not limited to, the SSA decision) to support its decision to terminate Mr. Singley's disability benefits. That Hartford reached a different conclusion than the SSA does not mean that its decision was not reasonable.[24] The SSA decision does not establish that Hartford's decision to terminate Mr. Singley's benefits was not supported by substantial evidence. Moreover, the standards of review under the SSA rules and ERISA are very different. Under the SSA's rules, once it is found that a claimant cannot perform the duties of his past work due to his physical condition, the burden shifts to the SSA to show that there are other jobs that the claimant can perform. Under ERISA and the Plan, however, claimant has the burden of proving entitlement to benefits. "That the Social Security Administration reached another conclusion, under another standard, does not mean that the decision of the plan administrator here was incorrect or ill-considered under the standard which here applies." *Freeman,* 823 F.Supp. at 416.

Plaintiff obviously disagrees with Hartford's decision to discontinue his long-term disability benefits. And the court notes that there is certainly room within the administrative record for a reasonable dispute about this. However, it is not for this court to second-guess Hartford's decision. Rather, this court must defer to Hartford unless it abused its discretion or its decision is not supported by substantial evidence. Based on the administrative record before this court, the court finds that Hartford did not abuse its discretion and its decision was supported by substantial evidence. Therefore, because Hartford has paid plaintiff the maximum amount of benefits to which he is entitled under the Policy, and because as previously noted, plaintiff's exclusive remedy is under ERISA and he cannot assert any claims under state law, the court finds that Hartford is entitled to summary judgment and plaintiff's complaint is dismissed with prejudice.

IT IS, THEREFORE, ORDERED AND ADJUDGED that Hartford and Halliburton's joint motion for summary judgment [# 9] is granted and plaintiff's complaint is dismissed with prejudice.

---

24. Moreover, it is worth noting that the administrative law judge reached his conclusion that plaintiff was entitled to disability benefits in spite of the opinions of state medical consultants that the plaintiff was able to work— although the judge noted that these experts did not have the opportunity to personally observe claimant's demeanor and testimony at the hearing and did not appear to have sufficiently credited the assessments of claimant's treating physicians.